Good morning, Your Honors. May it please the Court. My name is Jessica Dartnett, and this is Mr. George Marder-Troy. And we are here to speak on behalf of Plaintiff Appellate Mrs. Flora Motus. Mr. Alan Morrison is also here with us from Public Citizen, and we will be yielding 10 of our allotted 20 minutes to Mr. Morrison to discuss the preemption issue. With the Court's permission, I will spend 7 minutes of my time on opening argument, and I will reserve 3 of my minutes for rebuttal. Your Honors, the two most important reasons Mrs. Motus should be allowed to proceed past summary judgment on the actual causation issues in this case can be summed up very quickly. The first most important reason is that in order to survive summary judgment in this case, the Court held Mrs. Motus to a burden of proof that was both improper and impossible. Here I'm going to address the impossibility point first. In Richmond's holding, the Court basically held something that no court in the country, much less California, has ever held. And here all you have to do is read the Court's actual holding, and I quote, This Court's ruling is based only on the ground that plaintiff failed to prove that Dr. Troster would not have prescribed Zoloft if an adequate warning had been provided. The problem with this is that you cannot require a plaintiff to prove at the summary judgment stage what would have happened if a manufacturer had warned, because what would have happened if a warning had issued will always be a material question of fact by definition. Without contradiction, that he did not rely on anything Pfizer had said or written. So that being the case, it wouldn't make any difference whether Pfizer had given whatever the warning is that Motus would like for it to have given. There's two responses to that that are just immediately available on the record. Number one is that while he did say I did not rely on any statements from Pfizer or any material that they may have provided with me, he also stated that he visited with Pfizer drug representatives, that he discussed with them Zoloft's indications, that the samples that he gave to Mr. Motus came from a Pfizer drug representative. So, and a lot of his testimony states that he could not recall. But the point here is there is no evidence that contradicts the statement that he didn't rely, whatever it was that Pfizer said, whatever it was that any rep said to him, he said he did not rely on it. And that's not controverted. Now, I realize that he also said that if he had been told that there was a risk of suicide, an increased risk of suicide within the first few weeks of giving the drug, he would have passed that information on. To me, that's a slightly different issue than what you were just talking about. My response to that, again, there's two responses, but is that in California, you know, long and well-established case law, specifically I'll cite the Toole v. Merrill, Richard Merrill. The law in California holds that his testimony about whether or not he relied on anything is a jury question. It's something that the ---- It does, like in Toole or in Stevens, there is a reasonable basis in the evidence from which a jury could infer that he was ---- he actually relied on something else that he was told. But here, there's nothing like Stevens or Toole to show that he could have relied on a statement that diluted a warning or gave a misimpression that there was no risk at all to the drug. Actually, in the record, there was testimony from Dr. Trostler that the representatives did not warn him of akathisia, and they did not warn him of the risk of suicide. Now, also, in addition to that, So what? He said he didn't pay any attention to it. Right. But if you think about, like, it's not just a question of what his knowledge, like what ---- in California, for example, the duty to warn goes not just through the package insert. In California under Stevens, the duty to warn is through a variety of reasonable means. Let me ask you on that. Are you taking the position that a drug company has a duty personally to warn a physician? Personally to warn a specific physician? The duty in California ---- What's the best case for it? The best case for that is Stevens. Sure. Again, that's a situation where the drug company used the representatives negatively, that is, to detract from or dilute the warning that actually was given. That's different from the question I'm asking, which is, is there any case that has imposed an affirmative duty on a drug manufacturer personally, that is, to have a rep go in and say, Doctor, I want you to know that there is a risk that goes beyond what the label says? If the drug company has knowledge that a risk exists, and it's not even that a risk exists, it's that there's a reasonable association between a serious hazard with a drug and a side effect. They have a duty to warn about that. So the duty goes to the medical community beyond the label. And in Stevens ---- Actually, I think Stevens is exactly analogous to this case in the sense that in Stevens you have a situation where the court says, look, you know, lots of doctors don't read the package insert. This is why. Not only must drug companies warn the medical community through their doctor letters and package inserts, there's a variety of means in which they owe that duty. And specifically they talk about detail man. I would say that there's one fact in this record that should prevent summary judgment just by itself. You know, we know that he spoke to the drug representatives, and it's kind of to me it's illogical to say that Dr. Trostler's knowledge of Zoloft, he couldn't have relied on anything from Pfizer because Pfizer is the company responsible for putting Zoloft into being. Therefore, it's not just Dr. Trostler's what he read versus what he didn't read. It's what his knowledge and the omissions from his knowledge, you know, what he knew and didn't know about Zoloft is going to come directly or indirectly from Pfizer. So even though, you know, I know in respondents' pleadings, in Pfizer's pleadings, they say, well, they try to separate out the reliance issue from the did not read. And what they try to do is say, look, you know, he didn't read this. And he stated that he didn't rely on this other stuff either. But what that does is that takes two, like a few lines of deposition testimony and says that you can take those few lines of deposition testimony, ignore all the other material questions of fact on the real issue of the case, which is did its failure to warn through a variety of different reasonable means constitute an actual cause? Can Mrs. Motis prove at trial that but for Pfizer's failure to warn, her husband would not have died? And here, really what I think is most egregious about this order is that whose burden of proof was it? Pfizer brought a motion saying, and really they brought a motion saying that they could prove a negative at the summary judgment stage. If we had warned, it would not have made a difference. That's not something you can prove at summary judgment because it's inconsistent with the standard applicable at summary judgment. At trial, you can prove 51 percent. You know, more likely than not, it would have made a difference or it wouldn't have made a difference. And certainly, it would be Mrs. Motis's ---- Kagan. You're arguing against the Supreme Court's trilogy on that point. I mean, of course you can prove a negative. I mean, it's ---- Kagan. You can prove a negative to 51 ---- I just don't want to come up with the proof, is the point. Kagan. At trial. To provide summary judgment. Well, I guess the point here that I'm trying to make is that when Pfizer brings a motion saying he didn't read this and therefore, if we had warned, it would not have made a difference, Pfizer is the party responsible for bringing, for meeting that burden of proof. And what happened in this case was that the court did not understand that nearly bringing enough evidence, some evidence of that, some evidence that it might not have made a difference, is not enough to actually meet your summary judgment burden of proof. In other words, when a plaintiff moves for partial summary judgment on the rebuttable presumption issue, in other words, you have a situation where a drug company did not warn. And so the plaintiff says, you know what, there's a heeding presumption that if they would have warned, it would have made a difference. We want you to apply that in our court. We would like you to apply that in this case. Here, the district court said, no, I'm not going to apply that presumption. But what I think the court failed to understand is that nearly failing to apply the presumption – well, I'll back up. When the presumption applies, all the defendant has to do to survive summary judgment is come forward with enough evidence to rebut the presumption. Then the defendant gets to provide summary judgment. In other words, you know, here's the plaintiff. This presumption should apply. We should get partial summary judgment on it. And the defendant says, no, we've got some testimony here that says he didn't read the package insert. That evidence is sufficient to rebut the presumption to allow the defendant to get partial summary judgment. It is not sufficient to say, to prove that its failure to warn could have eliminated every question of fact in the record for purposes of summary judgment. And in this case, what I would argue is that because under Stevens and because under a long line of cases in California, the duty to the medical community is to warn through reasonable means, particularly through detailed people. Detailed people that we know saw Dr. Trostler. Because that duty exists, then what FISER's true burden was, not Mrs. Motis's, but FISER as the moving party, their moving – their true burden was to show that its failure to warn that Mr. – well, essentially that Dr. Trostler could not have become aware – if they had warned, Dr. Trostler could not have become aware of the warning through his discussions with colleagues. If they had warned, Dr. Trostler could not have become aware of that warning through discussions with patients. If they had warned, Dr. Trostler would not have become aware of that warning through meetings with drug sales representatives. If they had warned, Dr. Trostler would not have become aware of that warning or the existence of a different side effect profile than the one FISER does now warn about through any other means, including the hundreds of journal articles that Dr. Trostler testified he gets at his office solicited and unsolicited. You lost me. That statement had so many clauses in it. Sorry. What you just said. Okay, what I'm saying is this. What I'm saying is this. Because the duty in California and many other places is to warn through reasonable means, if you can promote it this way, then the duty is also to warn about side effects this way. If that's the duty, if FISER wants to get summary judgment, i.e., there's no disputed questions of material fact about whether a warning would have made a difference, they have to eliminate all the various questions of – well, they have to eliminate material questions of facts with respect to all the various avenues Dr. Trostler's awareness could have changed. For example, if they had warned six years – Zoloft came onto the market six years before Mr. Motis died. If they had warned six years before Mr. Motis died or a year before Mr. Motis died or a month before Mr. Motis died, might there have been something out there in the public that would – or something that Dr. Trostler had read that would trigger his mind to read the package insert in the first place? And what, to me, I guess on the impossibility point what I'm trying to get across is that could FISER prove with this testimony that a warning would not have made a difference at trial? They couldn't prove it to a certainty because you can't scientifically prove something to a certainty, but they could say more likely than not it wouldn't have made a difference. And at trial, that's fine. But at summary judgment, the standard is not – you can't be required to prove something that is necessarily speculative. What would have happened if something – other thing happened that didn't happen? You know, it's speculative. You can't resolve that at summary judgment. I think we understand that. Okay. Okay. Okay. Okay. Okay. I'll just wrap up. I have about 15 seconds. The other major reasons that Mrs. Motis should have been allowed to proceed beyond summary judgment is that Dr. Trostler's awareness about Zoloft's side effect profile is not the only thing relevant here. We know that Mr. Motis called his clinical psychologist cousin and his pharmacist sister and said, this drug, I can't sit still, this drug is making me crazy, could this drug be causing this or am I just going crazy? And they both said no. They said no because they didn't – they weren't warned. They didn't know. So here's two other members of the medical community who are completely unaware of something that we will – you know, a Daubert motion, we could argue that Pfizer knew. You know, the science isn't really before us because we're not here on Daubert. But, you know, that's another avenue with which Mrs. Motis could at trial show blood flow causation. And I will – oh, I'm sorry. Actually, I have a little bit more time than that. Well, you actually don't. Okay. You're down – but in any event, I think we understand your argument. We've got a preemption argument coming in. Do you wish to address that after or before the argument is made by a – I was going to address preemption on rebuttal. I was going to yield. All right. That's fine. Shall we then turn to – Okay. Do I have five minutes? Have I used a five minutes and 20 seconds? You have five minutes and 21 seconds left. Oh. Okay. I will yield before then to Mr. Morrison, unless you have questions about the executive position. I'm sorry. Mr. Morrison, I understood that you were going to reserve the preemption argument until after you've heard from Pfizer. It's entirely up to Your Honor. Whichever way Your Honor wants to do it. Well, it makes a certain amount of sense to do it that way. Do it. I'm ready to go now or later. All right. Let's hear from Pfizer and the government. Thank you. May it please the Court. Pierce O'Donnell for Pfizer, Your Honor, the Respondent. I am ceding 10 minutes of my argument to Mr. Kamenschein from the Department of Justice representing the United States of America, which, as you know, has filed an amicus brief urging this Court to reach the issue of preemption. I will confine for the most part my argument to why the district court was eminently correct, both on the stated ground as to California causation law and the evidence of the record and the ground he didn't reach, which is briefly I'll mention is an independent ground, as you know I've urged in the record. It's important to understand both my argument and that of the government that this case is set against a backdrop of a national tragedy and epidemic and mental illness. The FDA approved Zoloft in 1991 after having approved Prozac. The FDA goes through an elaborate process of review with experts, clinical studies. They found the drug was safe and effective for the intended use, which at that point was adults. The FDA dictated verbatim the class label that we have to use, and that's where the conflict with federal law comes. And, Your Honor, borrowing from a phrase from an earlier argument, we have a train wreck here. My client is being held to alleged duty in state court to vary substantially the label that the FDA has rejected 13 times. Well, change in terms of the label or engage in some form of communication with the treating health care community as to potential risks that may not be included in the printed label. We are not at liberty to publish labels or even printed materials or advertising. But you can't send a dear doctor letter without the FDA's permission. Absolutely not. You know something that happens? We're false and misleading advertising. It becomes a misbranded product, and we're subject to criminal and civil liability. This is exactly like the Calo Britt case in 1981 where the carrier petitioned the ICC to abandon a route, an unprofitable route. In that case, like in my case, the citizens groups that think that SSRI drugs are bad for people and shouldn't be on the market or should have all these warnings. It's been rejected by the FDA a dozen or more times. There, the brick company participated, and the ICC allowed abandonment. He then brought a state Iowa tort action, and the Supreme Court and Justice Marshall said there's absolute conflict preemption here because the agency charged with the determinations of fact and reasonableness, the expert, the ICC, said you could abandon. And we can't have you held liable as a regulated party in state court imposing tort duties when we've already had a determination from the supreme authority in that instance, the ICC. We have an identical situation Mr. Kamenschein will address in a few moments of the Pfizer dilemma here, the Hobson's choice we're put to, which is totally unfair. We're protected under California law in most states under Brown with some deference because we do deal in inherently dangerous products, but they have a great benefit. We're not talking about lawn mowers or perfume. We're talking about something that has benefited the lives of millions of Americans. One in five Americans suffer from mental illness, and NAMI, the National Alliance for the Mentally Ill, says 70% of those can be treated and many of them can be treated with wonder drugs like SSRIs. Are they a panacea? No, we've never said that. Does the FDA have an ongoing, as we speak today, investigation of Paxil and other drugs? Yes, but that's the place in Rockville, Maryland. With all due respect, not in Howard Judge Matz's courtroom or a state courtroom in California. There are two significant grounds to affirm this decision, and it really involves undisputed California causation law, which Judge Reimer was getting at in her questioning of counsel. Rule 56 established my burden to show there were no genuine issues of material fact as to causation, and the causation here is a causal link or connection between the alleged deficiency warnings and the injury to the plaintiff in this case, which was her husband's suicide. The plaintiff had the burden of bringing forward issues of evidence, competent evidence to show a material dispute, but at the end of the day, we have an undisputed record and clear California Supreme Court precedent requiring the affirmance of Judge Matz. Judge Matz's? The one thing I'm making is that his opinion didn't exactly deal with is Trostler's statement that if he had information that the risk of suicide would be increased within a couple of weeks of administering the drug, he would have passed that information on to his patients. Right, but he didn't say he would have altered his conduct and not prescribed the drug, and that's why that testimony is illegally irrelevant to the issue at hand. The issue at hand, very simply, is under California Supreme Court decision Mitchell v. Gonzalez, 1991, those in California understand that important decision, but they rejected the but-for test and established the substantial factor test for causation. The court in that ruling at page 1052 of 54 Cal 3rd set the standard that Judge Matz followed. If the conduct which is claimed to have caused the injury, that is not putting in the warnings that there's an alleged connection, association, correlation, whatever you want between this type of a drug and suicide or violence, if the conduct which is claimed to have caused the injury, quote, had nothing at all to do with the injuries, it could not be said the conduct was a factor, much less a substantial factor in the production of the injuries. Now you go to the Ramirez case, California Supreme Court, it's a sad case. The facts are very sad. A Spanish-speaking woman prescribed St. John's Children's Aspirin to her child who developed Reye's Syndrome. Had she read the label in English or had it been translated to her by one of the family members, it could have done it. The record shows this great tragedy of a human life could have been avoided. Nonetheless, the California Supreme Court held categorically that she had failed to show sufficient evidence of causation. There was, as in this case, a clear and indisputable break in the causal chain. Quoting the court at 6 Cal 4th at 555-56, quote, Plaintiff's mother who administered the St. John's Aspirin for children to the plaintiff neither read nor obtained translation of the product label. Thus, there is no conceivable causal connection between the representations or omissions that accompany the product and plaintiff's injury. That's the California Supreme Court. Judge Mass acknowledged Ramirez was the decisional authority in this case and that it was dispositive and he properly applied it to the undisputed record. The record is clear, as you suggested, Judge Reimer. This doctor is highly credible because he testified in ways that could expose him to potential civil liability. He said, I've prescribed a drug. I didn't read the label. I didn't read the PDR. I didn't read anything the company gave me. I didn't rely upon anything that any of the representatives of the company gave me. I prescribed the drug. Under California law, both Ramirez, Fogo, and other courts have ruled that that is a break in the causal chain because the critical element of reliance is missing. And here's how Judge Mass summed it up in his motion for reconsideration order. Quote, Dr. Trostler paid no attention to what Spicer said. Now, whether that's good or bad, we're not here for that. We're here for causation. He continues, it follows that the presence of a warning in the package insert or elsewhere would not have affected his conduct in any way, barring from Mitchell v. Gonzalez, nothing at all to do with the injury. Given Dr. Trostler's unequivocal statements during his deposition that he did not rely upon information from Spicer whatsoever, plaintiffs simply cannot create a genuine issue that the presence of an adequate warning would have affected his conduct. Now, we've assumed only for purposes of this motion that the warning was deficient. We've never conceded. In fact, there are warnings about suicide in the early period of the first two weeks on the label, and that's exactly what happened here. But we didn't address that issue because that may have created a disputed fact. We went to the jugular here. No conceivable causal connection for Ramirez v. Plow. There's an independent ground on which you could affirm if you want to or if you're not satisfied on the first ground, and we've raised that below and here. The doctor was not a mushroom. He was not in the dark about the debate, the scientific medical debate about SSRI drugs, which first came on the market in the 80s with the advent of Prozac. He said he was aware of but discounted the debate over the alleged risk of suicide associated with SSRI drugs. In other words, his awareness of the alleged association between suicide and these drugs, including Zoloft, provides a separate and additional break in the causal chain which independently supports affirmance. In other words, he already knew about the risks, and therefore any warnings in the world would have been inconsequential because he was aware of the risk. The California Courts of Appeal in Flanger and in Rossburg have clearly ruled that the failure to warn a doctor who prescribes a drug of a risk that he already knows about cannot be the legal cause of decedent's death. As the Rossburg court said, quote, we perceive no harm caused by failure to warn of a risk already known. And the second, fourth, and eleventh circuits following other state laws in Plummer, Stanback, and Christopher have arrived at the same conclusion. Counsel's discussion of the rebuttal presumption is inappropriate because they have waived that issue on appeal. It was a subject of scholarly debate below, but Judge Matz, they have not raised that issue on appeal. And finally, the evidence that they claim that Judge Matz should have taken into consideration after he gave them two years. This summary judgment came two years after the filing of the complaint and a lot of discovery, a lot of briefing. The evidence they say he rejected improperly is irrelevant. They're saying that we had a duty to warn relatives and a sister who was a pharmacist. Well, our duty doesn't run there. Our duty under the federal law, under California state law and Brown and Carlin, runs the learned intermediary for prescription drug, and that ran, of course, to Dr. Trostler. So the evidence that Judge Matz said that we were correct, even as a matter of law, would be legally irrelevant. I'd now like to save ten minutes for Mr. Kavinsky, Your Honor, to advance. And I also want to suggest to the Court that this is a unique case in which you should reach this issue. If you affirm on the state causation grounds, traditionally or typically, you wouldn't have to reach this. But this is a recurring issue of preemption in this particular field, with the FDA having weighed in on this issue for almost two decades. And I will leave to the United States to urge you on the merits of why you should reach that decision and find in this discrete factual circumstance why there is preemption. Thank you very much. Thank you, Mr. O'Donnell. May it please the Court, Robert Kamenschein representing the FDA. Let me say that counter to the briefing on the other side, we're not dealing here with a broad-gauge effort to foreclose state tort liability, and it's important to understand that. We're dealing with a very discrete, specific conflict preemption between the FDA's well-considered decision and what the science shows as to the risks with Zoloft, and any conceivable warning that could have been offered in addition to that warning that might have asserted some kind of relationship beyond that which the FDA found. Surprisingly, we find that we're not really challenging a great deal of Judge Matz's opinion. Because Judge Matz acknowledged that if in the circumstances in which there would be a conflict between the FDA's mandate and one of many warnings that the FDA would preempt, he also recognized that there could be a frustration of the Federal labeling requirements to do otherwise. And so what he came down to was a notion of overbreadth. He said, well, the plaintiff here has left it vague and undetermined as to what kind of warning might have been offered, and therefore it's possible in Judge Matz's view that one or more of these warnings might have done some good and yet been inconsistent with the FDA's determination. But in our view, there is no such conceivable warning that is the FDA, after fully exploring this issue, and let me just say in parentheses that this is an ongoing process, because science does not stand still, but that there is no additional warning as to any causation, relation, association between this drug, Zoloft, and suicide that the company could have offered. The existing labeling talks about the early period when the drug is first consumed and talks about high-risk patients and says they should be kept under close supervision. It points out that there is some degree of association between people who have taken the drug and, quote, suicidal ideation or attempt, and it even gives the frequency within a range of 1 out of 100 to 1 out of 1,000. But then it goes on to say that just because two things happen to occur simultaneously does not mean, and specifically disclaims, that that evidence shows causation. So that referring to public citizens' brief where it talks about, well, it may not be causation, but what about association? The fact is that whatever there is to say about the fact that A and B happen to occur together is already there in the label. And if they're suggesting that somehow more than that or there's a different kind of association or a higher level of association than that, then that's something to be brought to the attention of the FDA. And that's another very important point here, that is because this is an ongoing process, because, as is well known, and in this case it occurred, you can have petitions to the FDA from groups like the U.S. Congress, like Public Citizen, like the Church of Scientology, like others, complaining about the labeling and asserting that the labeling needs to be changed. And so if there's more evidence, that's the place to put it. And, of course, the FDA as an administrative agency, its determinations are subject to judicial review. So the notion that somehow this is an avoidance of judicial review is not correct either. Can I ask you a question? Are you saying that the conflict arises because anything other than what is written in the FDA-approved and mandated label would necessarily cause a conflict with the label? And, or, are you saying that the conflict is created because the FDA determines what is or is not supported by the relevant science and any warning to the FDA? That would deviate from that which is approved would not be supported by the relevant science? Well, the conflict arises, one, from the FDA's determination that these are the scientifically supportable risks and the statutory and regulatory requirement that the drug may not be mislabeled. Mislabeling means labeling that is false or misleading. And the position is that a label that suggested causation in any way, shape, or form would, at the time of Mr. Motis's death, and for that matter, right up to the present time, would be false or misleading. That's the conflict. And it's not a question. I think this is a really, really important point. This debate is put, they seek to frame this debate as one involving more protection for the public. Why is it wrong to have more? Can't we make it better? Can't we improve it? Sure, what the FDA did is fine. We're going to make it better. More is not always better. More sometimes can be counterproductive. To warn of something, to warn the physician, and it is aimed at the physician. To warn the physician about a danger that really has not been established is going to have consequences, albeit Dr. Fosler apparently didn't look, but we assume that the physicians normally do look. And a reasonable, prudent physician seeing a warning is going to change his or her judgments about what medication to prescribe, and it may well result in the patient not getting the benefit of the warning. And it may well result in the patient not getting the benefit of the drug that would be best for that patient. So it's not a question of improving or enhancing the patient's protection. It's a question of misleading the patient, misleading the doctor, I'm sorry. Judge Montz and I think the Lourdes and the Amigues also put a good deal of weight on the argument that the FDA standards are misleading. They're misleading because they're not going beyond the minimum standards so that if you go beyond the minimum standard, that's all you're doing is going beyond a minimum standard. You're not going beyond a prescribed limit, as it were. Well, this is not like a standard, you know, if you have a standard for an automobile windshield and said it had to resist dirt impacts and can't shatter, and someone comes along and says, you know what, that's fine, that's a minimum, but we want the exact same thing. We want these windshields to be really, really tough and to withstand greater impact when somebody stands on an overpass and throws a boulder down or brick. And we've had injuries like that right in Maryland in my own backyard. We want the windshield to be able to do better. That's not what this is. That's not a question of doing better. It's a question of scientific fact. Either under accepted scientific standards, there is a serious risk here or there isn't. Now, it's true that science moves on. It's true that there can be disagreements in the scientific community, but that's why Congress has put this authority in the FDA, and that's why there's a prohibition against mislabeling of having a false or misleading label. And that's why there are provisions also for the manufacturer to update the information to the FDA, as well as others to do it, but to update it, to get authorization for new labeling, and in an emergency situation, to put out a warning simultaneously notifying the FDA. But the FDA ultimately gets the saw, and that's the thing that Judge Reimers is concerned about. It's the FDA that's making the ultimate approval. The FDA is non-omniscient. It can't be always right. But that's the system that Congress has established here. Mr. Kamenstein, you may have already said this, but as I understood Judge Reimers' question, isn't your answer simply that the FDA is also concerned about the safe and efficacious use of drugs to treat a serious medical problem, and the agency does not want the drug to be under-prescribed by physicians based upon a warning that may not have any scientific basis? Exactly. That's right. And that's where the conflict arises. That's one major aspect of it, yes. No, I think that answers my question. Thank you very much for your argument. At the risk of not having enough time for my full preemption argument, I did want to talk about the jurisdictional issue on this as well, because it's important. It is clear to us that the cross-appeal in this case is improper. It's improper because Pfizer won the case entirely below. And it would not have been entitled to take an appeal if the plaintiff had chosen not to take an appeal, and therefore it cannot be a proper cross-appellant. That's not quite true. We can affirm on any ground that everything in the record is true. Yes. That's a different question from cross-appeal. I also find this argument a little odd from the amicus. I can understand why the plaintiff would want to make the argument. They've asked me to deal with the jurisdictional issue as well, Your Honor, and that's the reason I'm doing it. I realize you're partisans and not neutrals, but go ahead. As the government is in this case. Absolutely. All right. And this is important because Mr. O'Donnell has asked you to reach the preemption issue if you affirm, as plaintiffs urge you not to do, on the causation issue. And in that case, I don't believe you have any authority to affirm on that. The Supreme Court has suggested that it's a threshold issue. Is it? I believe it is. Preemption? No. Preemption? No, I don't believe it's a threshold issue. Well, they suggested it was. I'm not going to hold it was. Which case is this, Your Honor? Spreets, whatever it is. Spreetsman? Yes, Spreetsman. They said, you know, well, it's a threshold issue before we reach the merits or before we decide the validity of the claim. But not before jurisdiction. Well, no, of course, jurisdiction. But, I mean, that's just, you know, you're not going to get anywhere on that. So you might want to spend most of your time on the merits of the preemption. Let me talk about the alternative grounds argument, Your Honor, which I agree is a proper argument. The two principal reasons why this cannot be affirmed on the alternative grounds. First, the motion made in the trial court was for partial summary judgment. And second — What's left? Well, that's what I was going to say, Your Honor. The second is that this motion was made with respect to the original complaint. And the original complaint was amended 10 days after this motion was denied by Judge Matz, and there were two additional causes of action added. In addition — What's left? Pardon me, Your Honor? What is left? What is left, Your Honor, is the claims for negligent testing, which are part of the paragraph 28B. Negligent testing by who? By Pfizer of the drug. That led the FDA? Is this the same? No. It led the — they negligently tested it, and as a result, it went on the market. As a result, they produced the negligent testing to the FDA, which made a bum decision, which the Supreme Court has said is preempted. No, Your Honor. It didn't say that. It said the claim of fraud on the FDA. This is not a question — any more than bad — Negligent fraud isn't preempted, but fraud is. No, it's not fraud, Your Honor. It's negligence in the testing of the process, just like negligence in design in the law case is not preempted in a much more — a broader statute. The second is the claim of fraud. And last is strict liability, paragraph 40 of the amended complaint. Now, turning to the issue of the merits of the preemption claim, as Your Honor has recognized, both Pfizer and the government are not clear about whether they're making a broad preemption argument or a narrow preemption argument. There's a broad preemption argument which says that anything that's different from or in addition to what is on the label that we, the FDA, have approved is preempted. To the extent that they're making that argument, that that argument has no place in this statute. It has a place in many of the cases and the statutes on which they rely, which is under the medical device amendments, which specifically has a provision, 360K, which says you may not have any standard which is different from or in addition to. So insofar as the claim here is that whatever the label says is the end of the inquiry, we think that's too broad a claim, but that they may have a more narrow actual conflict preemption claim to which I want to turn now. Mr. Kamenschein's statement to us is correct, that nothing can be done without the approval of the FDA. What's left of the case? Because the plaintiff's theory has to rely on the fact that something more was needed. And if the FDA said nothing more could be offered unless we approve it, there's no more case left, isn't there? There are two things. The first thing is that Pfizer never asked the FDA to approve it. And we say they have an obligation because they have admitted in their files that they have studies about akathisia, another aspect of the case which Dr. Trostler has not talked about on summary judgment. It's a different disease. It has some effects of suicide, but it has other effects as well. And insofar as akathisia is at issue here, the FDA in none of its proceedings nor in any word in the FDA's brief talks about akathisia. So they haven't even addressed that. Obviously, the FDA cannot have decided it would be anything false and misleading or otherwise inappropriate as to an issue which they haven't decided any more than they was a problem if it wasn't addressed to them. So that's point number one. The second point is that even with respect to the actual labeling and for the question about whether there's an association as well as an actual causation, Pfizer has a duty under the FDA's regulations any time it knows about problems to go back to the FDA and ask that it be changed. This is not a train wreck case where the FDA has said you may not put on what you're supposed to put on. This is a case where Pfizer has chosen, that's our allegation at this point, for its own reasons not to ask the FDA to have broader warning labels than it actually had. Third is I do not think that the government's statement is correct. Why isn't it just fraud on the FDA? No, it's not fraud on the FDA. The FDA in the Buckman case specifically distinguished cases like this in which it said that the failure to make a claim, the claim of the fraud on the FDA was that the FDA would have done something different. We don't have to prove that the FDA would have done something different. All we have to show is that Pfizer reasonably should have done more in terms of disclosing. And if that required them to ask the FDA's permission before they did it, then they had to ask the FDA's permission. If the FDA had said, no, you may not do this in the face of permission, then we might have had the train wreck. We might have a situation like the tobacco statute in which Congress has dictated the warning and a tobacco company could not change it. But here, the FDA could have been asked and it didn't ask. But moreover, I do not believe there's any suggestion that the detail men who actually were the persons who informed Dr. Trostler here about the product, for which he then gave the product to Mr. Modis, that the detail men are limited to saying what is on the label. They obviously cannot undercut what's on the label, but there's nothing that forbids them from doing that. There's nothing that controls the seminars that Pfizer regularly conducts on behalf of its products for doctors. There's nothing that forbids Pfizer from publishing medical journal articles about this. There are a whole host of things that they can do without going to the doctor, to the FDA. And while it is true that to send your doctor letters out, they must either send them out first and then get the FDA's permission afterwards, and the same is true with labeling, there's no showing here at all, no claim that they even asked. And until they asked, we don't have a situation like Kalo Brick where they were denied, nor do we have a situation like Geier where the FDA was the agency gave two choices and the State Court wanted to cut out one of those choices. The situation here is very simple. Pfizer chose, this is our allegations, which for these purposes must stand, not to seek a broader warning when reasonable drug company would have sought a broader warning. And nothing in the Doctrine of Preemption says anything about the Federal Government telling them that they can't do that. We are, of course, in a situation where if we had tried to argue that they had to put a particular warning label on, or, for example, if we asked them to put a box warning label, the FDA has a little regulation, part of the same regulation we've cited, in which it says only we, the FDA, can decide to put box warning labels. We agree that that's out of bounds. But even without going to the FDA, they have a multitude of choices which they chose not to exercise. The jury, of course, may find that those were not reasonable, that the evidence was not there, and that the FDA would not have, and that it wouldn't have made any difference. I think it's hard for them to say that as a jury matter, that going to have it get the drug detail man had explained to Dr. Trostler all of the things we say he should have explained, that Dr. Trostler, in the face of that evidence, as opposed to gentleman ---- Well, there's no real difference between the detail man explaining all the things you say he should do and the label doing. Oh, yes, there is, Your Honor. Why? The detail man is right there. It's a misrepresentation of either which way you slice it, isn't it? If it goes beyond what the FDA has found to be the relevant and reasonable scientific evidence of risk. Well, the first place is I don't ---- The FDA has never found in the face of a request that it would not allow this to be put on the label. What it has said is we don't think there's enough to force Pfizer to put this on. There is no case of which we've ever seen in which a drug company has asked to put something on a label and it's been denied by the FDA. The FDA always allows the drug companies to do that. This is not a case where we're worried about people not getting this product. This, of course, is a product in the SSRI class of which there are a significant number of them, and they have different strengths and benefits. And so, therefore, we have a situation in which they can't take this one. They'll take something else. The doctors are fully aware of the risks and the benefits, and they are the ones who ought to be properly deciding this or not. This is a situation when the FDA asks, we would have done something different. That's exactly what Buckman says you don't have to deal with, and we don't think the court should have to deal with here either. Thank you. I have one minute for rebuttal since we're the party with the burden on this. Five quick points. First, negligence design would clearly be preempted. It is subsumed in the agency's decision as to safe and effectiveness, and it's clear there's myriad regulations for clinical studies, and the FDA actually approves the design of the studies and approves the drug's pharmacology, its safety, its dosage, et cetera. It would clearly be preempted. Secondly, this issue of akathisia is a proper mid-step, if you will. The fact of the matter is the issue of whether akathisia is a phenomenon. It is not suicide. It's not even suicide ideation. The petitioners, public citizens, brothers, over the last 14 years have put the issue of akathisia and warnings about akathisia to the FDA, and three times they have rejected it. This is exactly like the Geyer case. It's exactly like K-Low brick. In Geyer, there was a desire to have the agency, the Department of Transportation, adopt an all-airbag safety in the 80s, and that's what the tort claim insisted upon in the District of Columbia. The Supreme Court said we have a frustration of the congressional objective and we have a direct conflict. Just like K-Low brick, the brick manufacturer couldn't sue in state court the railroad, which had already gotten approval for the abandonment of the very line issue. So as Mr. Cavaney suggested, Your Honor, it's not a broad-gauge attack that all tort claims would be inappropriate. This is about as narrow and discreet as you can get, and clearly we have preemption under those circumstances. Finally, there's absolutely no evidence Dr. Trostler got any information from Pfizer or detailed persons that he relied upon. It was very clear he relied upon his own review of the literature and made his own independent clinical judgment. Finally, the mental health crisis in America would be greatly disturbed if you were not to hold preemption in this case, because the problem of under-prescription is a serious problem, and Your Honor, Judge Palmer, you alluded to that in your question to Mr. Kavanshian. We are not free willy-nilly to expand labels without the approval of the FDA. And finally, the watchword, the talisman at the FDA, is reasonable scientific basis for a warning. There are no epidemiological studies. There is nothing in the science or the literature to date that Mr. Modis would have justified the FDA granting a petition by us or anyone else. In fact, they have three times denied it. Thank you very much. Two points to that, Mr. O'Donnell. Yes, Your Honor. Would you respond to the point that Mr. Morrison made with regard to what would remain of the case? There would be nothing left, because Your Honor is right. The appropriate procedure actually, but we're here in a somewhat procedural different posture, is to address the preemption issue. If it's preempted, we don't have to get to issues of state law. Every single claim they brought, whether it's fraud, breach of express warranty, or negligent design, is preempted, Your Honor, because each one of those would run afoul of the FDA's decision that it's safe and effective. Now, they didn't raise that issue below. Negligent design, as I said, is a little bit different than failure to warn. But under really section 402A, comment K, pharmaceutical products ultimately, when you try the cases, are tried solely on a failure to warn basis. That's the basis for our liability under California law. So ultimately, negligent design, in my experience, having tried these cases, are dismissed, because the only thing you're allowed as a matter of law to bring to trial in a strict liability prescription drug context is the failure to warn, which we believe is preempted here. But negligent design would also be preempted if that's ever been briefed. Thank you very much. Roberts. Thank you all, counsel. Also, we appreciate the argument just made by all parties. And the matter just argued will be submitted. The court will stand adjourned. All rise. This court for discussion stands adjourned.
judges: Wallace, Rymer, Tallman